UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PET SILK, INC., | § | |
|     *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-06-2465 |
| | § | |
| MARIA JACKSON, ET AL., | § | |
|     *Defendants*. | § | |

**ORDER FOR PRELIMINARY INJUNCTION**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT THEREOF**

Pending before the court is plaintiff's motion for preliminary injunction. Dkt. 1. The court conducted a hearing on March 13, 2007, heard testimony, and admitted exhibits concerning the preliminary injunction. After considering the arguments of the parties and the applicable law, the court is of the opinion that the motion should be GRANTED as specified below. Therefore, the court makes the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT[1]**

The plaintiff, Pet Silk, Inc. ("PSI"), is a Texas corporation in the business of selling pet grooming products through distributors worldwide. Beauty Elite Group holds the registered trademark Pet Silk® and has granted PSI the exclusive license for the use of the mark. PSI has been operating its website **www.petsilk.com** for the last 15 years. PSI is a wholesale business deriving its income from distributors both online and in pet supply retail stores. Currently PSI has approximately 40 to 50 distributors, with perhaps 15 to 25 of those operating websites.

---

[1] To the extent that any finding of fact is more properly characterized as a conclusion of law, or vice versa, the court adopts it as such.

The defendants, Maria and Robert Jackson, run a California company d/b/a under the name MJM Company ("MJM").[2] During a four year period, MJM was an approved distributor of Pet Silk® products. However, according to PSI, the business arrangement was problematic from the beginning. The court heard testimony regarding discussions about the look of the MJM website. It too closely mirrored the look of the PSI website. The Pet Silk® logo was prominently displayed with insufficient or no indication that the site actually belonged to MJM—a distributor—rather than to the mark owner of Pet Silk® or its exclusive licensee. Also, MJM began to offer a reseller program on its website, essentially creating sub-distributors. PSI asked MJM to remove the information from the site and cease offering the program because it had not authorized MJM to do so. MJM finally complied in October of 2006, after this case was filed. At one point Maria Jackson made statements to PSI's customer service representative to the effect that MJM owned some property rights to Pet Silk® artwork. Other problems involved customer service issues. MJM customers would call PSI customer service with complaints, unaware that they had purchased their product from MJM. Eventually, in July of 2006, PSI severed its relationship with MJM entirely. PSI no longer sells Pet Silk® products to MJM. Any Pet Silk® products that MJM sells on its website are procured through other distributors of PSI's products. With the exception of the disclaimer on the **petsilkonline** redirect page, MJM still implicitly holds itself out as a distributor or reseller of Pet Silk® products. Moreover, a visit to any of MJM's web sites reveals that MJM still sells Pet Silk® products.

As of the date of the hearing, MJM operated several websites, including

---

[2] Defendants use several company names, including MJM Company, MJM Company - West, MJM Company, L.L.C., and MJM Enterprises. None of these business entities appears to be incorporated.

**www.petsilkonline.com**[3] and **www.mjm-petsilk.com**.  The webpage at **www.petsilkonline.com** states as follows:

Online Distributor For Pet Silk Products
... Hair Care For Dogs & Cats
1-818-XXX-XXXX[4]

Welcome  As Always ...
Customer Service Is Our Priority

We extend sincere appreciation and best wishes to you, our customers.
Please contact us anytime for continuing customer service and support.

Pet Silk®  Products manufactured in Houston, TX
will no longer be available at this location.
**• Purchase PetSilk® From This Dependable Source • Knowledgeable Support >>**

A carefully approved selection of grooming products and grooming resources
from the industry's most respected manufacturers will be offered instead.
**• Preview >>**
Please return for redirection to our new Internet location.

Email:  Contact Us
Phone: 818.XXX.XXXX[5]

This page ostensibly informs the customer that Pet Silk® is no longer available at this web address. However, by following the first hyperlink on the webpage, the reader is redirected to **www.mjm-petsilk.com.**  The webpage lists MJM Company - West in large typeface at the top, and offers links to the various Pet Silk® products.  The page uses photographs of the Pet Silk® bottles, but no other Pet Silk® artwork.  The entire MJM website makes no mention that MJM is a distributor for Pet

---

[3] All phrases designated by bold typeface and underlining are either web pages or hyperlinks to web pages

[4] Redacted by the court.

[5] Redacted by the court.

Silk®. However, the main webpage has the MJM Company name at the top of the page in large typeface. Depending on which hyperlinks the reader follows, the links lead to pages where the reader can order products. Or, it may lead to the Pet Silk® Product Line page selling Pet Silk® and two other pet grooming lines unrelated to Pet Silk®. At least one of these products is placed near the top of the page with pictures of the bottles and blurbs with equal prominence to the Pet Silk® products. More importantly, the second hyperlink purports to send customers to a site with other manufacturers' "carefully approved selection . . . from the industry's most respected manufacturers . . . instead." PSI objects that MJM has used their Pet Silk® mark in both the domain name and metatags[6] to lure Pet Silk customers for the purpose of selling them other manufacturers' products. Indeed, following that hyperlink takes the customer to the **www.mjmcompany.com** website offering several dog grooming product lines in addition to Pet Silk®.

By contrast, a search on Google for Pet Silk® also produces **www.purecanine.com**, **www.PetEdge.com**, **www.3cdog.com**, and **www.bestinshowboutique.com**, to name a few. These companies sell Pet Silk® products and other dog grooming products. However, they do not have the mark Pet Silk® in their domain name. Some distributors outside the United States do have the Pet Silk® mark in their domain name, like **www.petsilk.it** in Italy or **www.petsilk.nl** in Holland. However, despite the court's lack of familiarity with Italian and Dutch, a review of those sites shows that they exclusively carry Pet Silk® products. Other European sites that sell Pet Silk® as well as other products do not have Pet Silk® in their domain name.

---

[6] "A 'metatag' is a list of words hidden in a web site acting as an index or reference source identifying the content of the web site for search engines." J. THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 25:69 (4th ed.). Metatags have been "analogized to the subject index of a card catalog indicating the general subject of a book." *Id.*

PSI filed its complaint and motion for preliminary injunction in July of 2006. Service of process was delayed but finally effected through alternative means in December of 2006. During the hearing on March 13, 2007, the plaintiff requested that the court enjoin defendants from certain actions. First, PSI wants MJM to be enjoined from using its trademark—Pet Silk®—in its domain name, now and in the future. This includes taking down the domains **www.petsilkonline.com** and **www.mjm-petsilk.com** entirely. PSI does not wish to acquire these domains for itself. It merely asks that MJM stop using them. Second, PSI asks the court to enjoin MJM from holding itself out as PSI or as the manufacturer, main distributor, licensee, or any similar relation to Pet Silk® products. This includes, but is not limited to, clearly marking all invoices and literature from MJM to their customers who buy Pet Silk® products as being from MJM Company, not PSI or Pet Silk®. And third, PSI wishes MJM to be enjoined from entering into or in any way representing that it has the capacity to enter into distributorship agreements where MJM would act as wholesaler with the customer as a sub-distributor. PSI argues that injunction is proper under the Lanham Act, 15 U.S.C. § 1125 and under the Texas Business and Commerce Code § 16.26.

## Conclusions of Law

In order to prevail on a motion for preliminary injunction, a party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is denied; (3) the potential injury outweighs any damage that the injunction may cause the non-moving party; and (4) granting the preliminary injunction will not disserve the public interest. *See Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003); *Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908, 918 (5th Cir. 2000). A preliminary injunction is an extraordinary remedy which will only be granted if the movant has clearly carried the burden

as to all four elements. *Guy Carpenter*, 334 F.3d at 464; *Evergreen Presbyterian*, 235 F.3d at 917. However, injunctions are appropriate remedies under the Lanham Act and the Texas Business and Commerce Code. 15 U.S.C. § 1125; TEX. BUS. & COM CODE § 16.26. Moreover, in cases where the alleged infringement involves a former licensee, the need for injunction becomes more compelling. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004).

**1.    Likelihood of Success**

Sections 1114(1) and 1125 of the Lanham Act combine to protect owners of trademarks from infringement due to dilution and cyberpiracy. PSI brings claims under several subsections of § 1125. Additionally, PSI claims that MJM has violated the Texas trademark and unfair competition statute codified at § 16.26 of the Texas Business and Commerce Code. Since the inquiry under the Texas statute is coterminous with that under the Lanham Act—with one relevant exception—the court includes the Texas statutes by implication in its review. *Advantage Rent-A-Car, Inc. v. Enterprise Rent-A-Car, Co.*, 238 F.3d 378, 380 (5th Cir. 2001) ("Under Texas law, to determine whether a mark is distinctive enough for dilution, the court considers factors much like those used in the [Lanham Act] fame analysis."); *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) ("A determination of a likelihood of confusion under federal law is the same as the determination . . . under Texas law for a trademark infringement claim.").

**A.    Trademark Infringement/Unfair competition**

Section 1114(1) of the Lanham Act specifies a cause of action against:

> [a]ny person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1). In order to show trademark infringement under the Lanham Act, PSI must demonstrate "(1) that it has a valid mark that is entitled to protection under the [Lanham] Act, and (2) that use of the defendant's mark infringes, or is likely to infringe, the mark of the plaintiff." *Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d. Cir. 1997); *see also Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th. Cir. 1989). PSI meets the first prong, because its mark has been registered since October 21, 1997. Dkt. 1, Ex. 1.

> Any . . . mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b) of this section, which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115(a). "A registration . . . becomes conclusive evidence of a registrant's exclusive right to use a mark after five consecutive years of continuous use in commerce, subject to a few enumerated defenses." *Elvis Enters.,* 141 F.3d at 194. MJM asserts no equitable defenses to the validity of the mark. Accordingly, PSI has shown enough evidence for the infringement inquiry that, as a matter of law, the mark is entitled to protection under the Lanham Act.

The real question becomes whether there is a likelihood of confusion. Again, PSI can easily meet this prong, because it has shown evidence of actual customer confusion. "Evidence of actual confusion [is] the best evidence of a likelihood of confusion." *Elvis Enters*, 141 F.3d at 203 (internal quotations omitted). At the hearing, PSI adduced evidence, both through email admitted as exhibits and testimony by witnesses, of several documented incidents where a customer called the MJM phone number to try to speak with PSI about a possible Pet Silk® distributorship. Also, PSI's

customer service manager testified that she had received numerous calls from angry customers who, believing they had ordered from Pet Silk rather than a distributor, demanded to know why their order had not yet arrived. This problem, she said, did not occur with the customers of other distributors. The likelihood has become reality. Even if PSI had not shown actual confusion, the fact that MJM adopted the mark as part of its domain name creates initial interest confusion as to the source or sponsor of the web site and this is recognized as infringement under the Lanham Act. *See PACCAR, Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 250 (6th Cir. 2003) *overruled on other grounds by KP Perm. Make-Up, Inc. v. Lasting Impression I, Inc.* 543 U.S. 111, 125 S. Ct. 542 (2004) ("An infringing domain name has the potential to misdirect consumers as they search for web sites associated with the owner of a trademark."). MJM argues that because they now display a disclaimer on the petsilkonline page, there is no more chance of ongoing confusion. However, "[a] disclaimer disavowing affiliation with the trademark owner read by a consumer after reaching the web site comes too late." *Id.* PSI has thus met its burden to show likelihood of success on its trademark infringement claim under the Lanham Act.

**B.    Dilution**

Plaintiff also brings a claim for dilution of a protected mark. There are three inquiries involved in a determination of dilution under the Lanham Act. First, PSI must show that its mark is famous and distinctive.[7] *Advantage*, 238 F.3d at 380. Second, MJM must have adopted the mark after the Pet Silk® mark became famous. And, third, PSI must show that MJM caused a likelihood of dilution of the Pet Silk® mark. Although MJM has not contested the characterization of the Pet

---

[7] "The Texas anti-dilution statute explicitly requires only distinctiveness, not fame." *Advantage*, 238 F.3d at 381; TEX. BUS. & COM. CODE § 16.29.

Silk® mark as famous, a review of the factors for a famous mark under § 1125(c)(1) demonstrates that the characterization is valid.[8] The Pet Silk® mark has been registered on the Principal Register of the United States Patent and Trademark Office for the last 10 years and has been in use for the last 15 years at least. PSI has distributors all over the world. PSI testified, and MJM does not contest, that Pet Silk® has name recognition in the pet supply and dog grooming market. And, the Fifth Circuit has held that market fame is sufficient. *Id.* PSI has not licensed the use of its name in the domain of any of its distributors save a few in Europe that deal exclusively in Pet Silk® products. Therefore, the mark meets § 1125(c)(2)(A)'s definition of famous.

In addition to being a famous mark, the Pet Silk® mark must also be distinctive. "[A] particular 'mark' qualifies for trademark protection only to the extent that it distinguishes a product. The law classifies marks into five different categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Sport Supply Grp., Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 460 n. 7 (5th Cir. 2003) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753 (1992)). Marks classified in the later three categories are considered inherently distinctive and therefore entitled to protection. *Id.* A "suggestive mark" requires the purchaser to use their

---

[8] [A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
    (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
    (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
    (iii) The extent of actual recognition of the mark.
    (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.
15 U.S.C. § 1125(2)(A).

9

imagination to reach a conclusion as to the nature of the goods. *Id.* (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d. Cir. 1999)).  Some examples of a "suggestive mark" would be "Penguin" for refrigerators, or "Business Week." *Id.* (citing William M. Landes & Richard A. Posner, Trademark Law: An Economic Perspective, 30 J. LAW & ECON. 265, 291 (1987)); *Quantum*, 83 F. Supp. 2d at 817 (quoting *Union Nat'l Bank of Texas, Laredo, Texas v. Union Nat'l Bank of Texas, Austin, Texas*, 909 F.2d 839, 844 (5th Cir. 1990)). The mark Pet Silk® is at least a suggestive mark, and therefore inherently distinctive.[9]

As for the second prong, PSI has shown that its mark has been registered for 10 years. MJM and PSI did not enter into a distributorship relationship until 4 years ago. Absent evidence to the contrary, the court may presume that MJM adopted the mark after the Pet Silk® mark became famous. Otherwise, it seems illogical that MJM—a California entity—would want to be a distributor for a company in Texas, or for that matter, even know about Pet Silk®. Lastly, PSI must show that there has been dilution. There are two types of dilution. Here, the plaintiff has argued that the protected mark has been diluted by blurring. The Lanham Act defines blurring as:

> association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:
> (i) The degree of similarity between the mark or trade name and the famous mark.
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

---

[9] Additionally, there is a presumption that since the mark is registered, it is at the very least a "descriptive mark" that has achieved acquired distinctiveness. 15 U.S.C. § 1052. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196, 105 S. Ct. 658 (1985) ("A mark that is merely descriptive of an applicant's goods or services is not registrable unless the mark has secondary meaning.").

>  (iv) The degree of recognition of the famous mark.
>  (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
>  (vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B)(1). PSI has demonstrated most, if not all, of the factors in its claim. The two marks are similar since MJM has incorporated Pet Silk® as part of its web domain name. And, in phone calls with potential Pet Silk® distributors, MJM has held itself out to be Pet Silk® itself. So, the marks are similar because they are, in fact, the same mark. As discussed above, the Pet Silk® mark has achieved distinction in its market. Pet Silk® is internationally known for its pet-grooming products. Moreover, there can be no doubt that MJM intended to create an association with Pet Silk® when it put the name in its domain. MJM went so far as to set itself up as a type of "sub-wholesaler" by offering a reseller agreement to its customers. *See* Dkt. 1, Ex. 4. Additionally, there was testimony at the hearing that actual association did occur. Some customers, upon calling the MJM number, were told by Maria Jackson that the only way to become a Pet Silk® distributor was through her. MJM does not refute this testimony, but argues merely that injunction is inappropriate because MJM has removed the reseller agreement from its web site and no longer offers reseller status to customers. Nevertheless, Pet Silk has demonstrated that MJM's use of its mark meets all of the factors under § 1125(c)(2)(B)(1).

      The Fifth Circuit used to read the statute as requiring actual economic harm to prove dilution. *Westchester Media v. PRL Holdings, Inc.*, 214 F.3d 658, 670-71 (5th Cir. 2000); *Advantage*, 238 F.3d at 380. This requirement was adopted from the Fourth Circuit's interpretation based on a plain reading of the language of the statute. *Westchester*, 214 F.3d at 670-71. However, the court quoted the Fourth Circuit as admitting that "an actual harm standard allows 'excessive literalism to defeat

11

the intent of the statute.'" *Id.* at 671 (quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 224 (4th Cir. 1999)).  Congress agreed and changed the language of the statute effective October 6, 2006. *See* Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, § 2, 120 Stat. 1730, 1730-33 (2006).  Section 1125(c)(1) as modified now reads:

> [s]ubject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce <u>that is likely to cause dilution</u> by blurring or dilution by tarnishment of the famous mark, <u>regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.</u>

§ 1125(c)(1) (emphasis added).  Under the new definition of dilution, the court finds that PSI has presented enough evidence that it has a likelihood of success on its federal dilution claim.

### C.     Cyberpiracy/Cybersquatting

Lastly, Pet Silk brings a claim for cyberpiracy under § 1125(d) of the Lanham Act.  The cyberpiracy or, as it is sometimes known, cybersquatting prevention section provides that:

> [a] person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
> (i) has a bad faith intent to profit from that mark . . . and
> (ii) registers, traffics in, or uses a domain name that--
> • • •
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark . . . .

15 U.S.C. § 1525(d)(1)(A).  MJM uses not one but two domain names—**www.petsilkonline.com** and **www.mjm-petsilk.com**—that are at the very least confusingly similar to the Pet Silk® mark. And, as discussed above, the Pet Silk® mark was already famous, by the time MJM registered its domains.  The bad faith requirement of this section may be informed by a series of non-inclusive

factors also included in the section.[10] § 1125(d)(1)(B). Many of these factors argue strongly for a finding of bad faith on the part of MJM. First, MJM has no trademark or intellectual property rights in the Pet Silk® mark. Second, MJM incorporates the entire famous trademark unchanged into its domain names. Third, MJM did not use the Pet Silk® mark until it began selling Pet Silk's® products, so it has no bona fide prior use. Fourth, MJM has used the mark commercially with the intent to divert customers to a site selling not only Pet Silk® brand products but competitors' pet

---

[10] In determining whether a person has a bad faith intent described under subparagraph (a), a court may consider factors such as, but not limited to
  (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
  (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
  (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
  (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
  (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
  (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
  (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
  (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
  (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

grooming products as well.  And, this diversion has actually harmed PSI's goodwill.  *See E & J Gallo Winery v. Spider Webs, Ltd.*, 286 F.3d 270, 279 (5th Cir. 2002).  MJM customers, thinking they had ordered from PSI, became angry when MJM either failed to deliver product on time or delivered damaged products without refund or replacement.  Additionally, "a presumption of bad faith arises from the choice of the [senior user's] name because it is inferrable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark."  *E & J Gallo*, 286 F.3d at 277.  MJM does not argue that it believed that the use of the mark was fair use or otherwise lawful—a valid defense to cyberpiracy. § 1525(d)(1)(B)(ii).  Therefore, the court finds that for the purposes of § 1125(d) of the Lanham Act, MJM had the requisite bad faith.  PSI has made the showing required by equity that its cyberpiracy claim has a likelihood of success.

**2.     Irreparable Injury**

MJM does not contest this prong of the preliminary injunction inquiry.  However, since PSI has demonstrated actual confusion, it has also demonstrated irreparable injury as a matter of law on its trademark infringement claim.  *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 128, 130 (2d Cir. 2004) ("In a trademark infringement case, proof of a likelihood of confusion established both a likelihood of success on the merits and irreparable harm."); *Quantum Fitness Corp. v. Quantum Lifestyles Centers, L.L.C.*, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999) ("When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury.").  Additionally, PSI's demonstrated losses include mainly goodwill for which it is difficult to calculate damages.  Therefore, the injury can be classified as irreparable because PSI's "potential pecuniary injuries are both unquantifiable and irreparable."  *Quantum*, 83 F. Supp. 2d at 831.

3.     **Potential Damage to MJM**

MJM has not asserted any specific potential damages. It is unlikely that a preliminary injunction would have much affect on MJM's ability to attract customers. MJM has a website that is properly in its name alone, **www.mjmcompany.com**. PSI does not object to MJM's purchase of advertising on Google and use of Pet Silk® in its metadata. Therefore, if MJM designates the site that appears first in a Google search as its legitimate site, it should get the same number of legitimate customers. Therefore, any damage to MJM from an injunction is minimal and does not outweigh PSI's interest in maintaining its reputation and goodwill.

4.     **Public Interest**

The last inquiry when deciding whether to grant an injunction is whether the injunction is in the public interest. *Guy Carpenter*, 334 F.3d at 464. "The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Quantum*, 83 F. Supp. 2d at 832. Notably, injunction was expressly contemplated by Congress as a remedy for trademark infringement. *See* 15 U.S.C. § 1125(c)(1). Therefore, the court concludes that the public interest is served by issuing injunctive relief for PSI.

## CONCLUSION

Therefore it is the court's opinion that plaintiffs have met their burden for imposition of a preliminary injunction. Accordingly, the court ORDERS

1.     that pursuant to 15 U.S.C. § 1125(d)(1)(C) defendants shall REMOVE and CEASE using any website that contains Pet Silk® or any variation of Pet Silk® in its domain name. This injunction shall begin from this date and continue until the resolution of this case when the injunction will either be lifted or converted into a permanent injunction.

2.	that defendants shall CEASE holding themselves out as Pet Silk, Inc. either on their website or through any other media.  This includes, but is not limited to, clearly marking all invoices and literature from MJM to their customers who buy Pet Silk® products as being from MJM Company, not Pet Silk®.

3.	and, defendants shall CEASE offering or attempting to offer any relationship that would function as a sub-distributorship of Pet Silk® products or reseller agreement to third parties.

Any violation of this order shall lead to sanctions.

It is so ORDERED.

Signed at Houston, Texas on March 28, 2007.

_____
Gray H. Miller
United States District Judge